Your Honors, this is Rudy Telscher. And during the testing, there's HVAC in the background, which is not loud in this room, but I'm told it might be loud for you. So I'm going to do my best to mute while you're asking questions. I don't hear it. Good, good, good, good. If you do, let me know, and I'll do my best to address it for you. Good morning, Your Honors. Rudy Telscher on behalf of Emerson. Obviously, the court does not need to reach the fee issues if it reverses on the merits. If the court does reach the merits, or reach the fee issues, there are significant issues in play that ultimately implicate, as best we can tell from the cases found by the parties, the largest fee award in U.S. history. I'm sorry, before you begin that, if we find that there is error, but we demand to the district court to find whether or not it's harmless or not, what do we do with the fees in that situation? Well, I think you would probably want to address the fees unless you were going to have the court consider the fees again, because it would be possible to go back down and have the district court judge find the error harmless, which we disagree with, of course, but if the court found it harmless, then the fee issues would still be pending. So it would be my estimation that you would probably want to reach the fee issues to provide guidance to the district court. Because it seems to me we would want to look at the fees when there's a final fee award from the district court, and if we remand for further litigation in the district court there's going to be a new fee petition and finding. I think that's the law, right? I mean, my understanding is you don't do piecemeal evaluation of attorney's fees awards. I think that's right, Your Honor. So you could, even in that instance, not rule on the fees and send it back down for further proceedings. But the point is well taken. I mean, if there was an error in not allowing discovery, it might be good for the district court judge to know that before it went through doing the fee awards again so that it would have that guidance. Your Honor, I agree with you. There are two major components to that. One, the billing records. And I think that you could address that to the court. And further on the limited discovery relating to offset, Court of E Brown makes absolutely clear that the district court judge was to have looked at the Facebook settlement monies that were received in assessing offset. Quarter says directly that that is reversible error not to do so. So if we went back down to your point, I think it would be helpful to provide guidance to the district court that that limit of discovery should have been allowed and that Emerson should have had the same billing records that the district court had so that it could participate in the debate as to what a reasonable fee should have been here. There are some concerns with this. I mean, with the amount of the attorney's fees awarded, there are some concerns about the lot billing, the lack of contemporaneous records. And it just seems a little bit casual for a fee award of this magnitude. Your Honor, to give perspective, as best we can tell, this is the largest trade secret fee award in U.S. history if it stands, and it would be the second largest fee award in an IP case of all time, second only to the Oracle decision. That's based on my knowledge of the cases and it's based on what Blade Room could find. So yes, in a case of this magnitude, the billing records should have been produced and it would have been improper for those to be reviewed in camera. Yamada is right on point that both the district court judge, the special master to the extent he was involved and Emerson all should have had those billing records. And once we look at the case, in our view, there is substantial legal error in the fee award in four categories. One, due process, which we just talked about. Two, offset, which I've briefly talked about. Foreign counsel fees for Mr. Joy also involve legal error under Winter Raud. And there is the interesting legal issue involving Crawford and Shady Grove in this court's decisions in the SEVIS and First National relating to whether the cost shifting provision of 3426 was applicable or whether that was trumped by federal law under 54D, 1920 and 1821. So there's substantial legal error in the record and if it's sent back down, that legal error would need to be addressed. And at this point, I can talk for a while about these issues, but also I know we've briefed these issues. So the one that I'm going to start with, just because it's a glaring legal error in my view is Winter Raud. The district court plainly misread Winter Raud. If you look at footnote four of Winter Raud, and then if you look at page 825 of Winter Raud, what Winter Raud says, this Ninth Circuit decision says that if an attorney is unqualified for Pro Hoc Vitae, you don't reach the second prong. So the first prong is, is an out-of-state lawyer who wasn't Pro Hoc'd in, could they certainly, that's the words, certainly had been Pro Hoc'd in. In Winter Raud, they were looking at an Oregon lawyer who was highly qualified, he contributed time and the court found that he was probably going to be Pro Hoc'd in. So what the court said in Winter Raud is it's not certain that he could have been Pro Hoc'd in. So the court reached the second prong. Right as the court goes to the second prong, which talks about paralegals and IT personnel who did not appear before the court but contributed, footnote four is critical. And it says in footnote four, we do not reach the second prong if the lawyer is not qualified for Pro Hoc. This point was so important to the court that at page 825 it repeated it. There is no case cited by Blade Room and no case that we found that allows a foreign lawyer to practice US law and be reimbursed for their fees. We think Winter Raud's directly on point and that's a purely legal issue. Turning to the issue of expert fees. Again, this court in Aceves and First National Bank said that in the context of section 998, which is an offer of settlement, in the context of an offer of settlement, there's a strong policy that if you try the case and what you get is less than the offer of settlement, the cost can be shift. This court found that state law under section 998 is trumped by federal law and the cost can't be shift under Crawford and Shady Grows. So in this particular instance, we're dealing with a different statute, which is section 3426. This court has never directly considered whether the cost shifting provision of section 3426 is trumped by the federal law of Crawford. I will point out to the court that the fee shifting provision of section 998 that was at issue in Aceves and First National is nearly identical to the cost shifting provision in 3426, which would mean under this- Mr. Solster, can I interrupt briefly? Please. We're talking mostly of Michael Joy's fees here, correct? Correct. All right. I'm not sure that Winter Raub necessarily gets you where you want to go here, but regardless of that, there was a cut of 55% in Joy's fees, nevertheless, he got 45% of the fees he claimed. My sense was that the district court had a special master's report, or at least some evidence indicating that Michael Joy was not working as part of a litigation team, but he was general in-house. And Milgard Tempering, Ninth Circuit in 1985, said those are not the types of fees that are compensable. So it would seem to me that Michael Joy wasn't entitled to anything in light of that finding. Maybe I'm missing something, but that's how I saw the issue of the in-house fees. Your Honor, I agree. There's two separate reasons why Mr. Joy is entitled to nothing. One, under Winter Raub, and I would say if you go look at footnote four and you look at the same language that is repeated at page 285 of that decision, that's one reason. But now let me turn to your question, your question is just as a matter of regular law, can an in-house counsel acting in ordinary capacity receive an attorney fee award? And the answer's no. If you look at the cases where in-house counselor awarded fees, they're part of the trial team or they're actively part of the litigation team even if they didn't try the case. What we have here is Mr. Joy, no like any of my in-house clients. My in-house clients look at my briefs and they edit them. They have thoughts about the case. They meet with me and they take notes. The things that Mr. Joy did are exactly what an ordinary in-house counsel would do. Neither the special master nor the district court cited any evidence at all that Mr. Joy did something beyond ordinary work of an in-house counsel. And of course, Emerson, we haven't seen any records. So we don't have Mr. Joy's notes or his travel logs. They're so heavily redacted, we can't tell what's going on. And Bladrum's point is we heavily redacted those because they include his notes about legal discussion. I'm sympathetic that his notes probably do. The problem is you can't use notes as a sword and a shield. So you're correct. The decision that you cite is right on point. Mr. Joy should have been entitled to no fees. And none of us should be concerned about that outcome. Ferrella is asking for $17 million in fees, which is already an extraordinary sum. To put Mr. Joy's fees on top of it, one is unfair to Emerson. He wasn't a U.S. lawyer. He wasn't qualified in U.S. trade secret law. So the fact that he was interested is understandable, but that's not compensable. And there's nothing unfair about that to Bladrum. Council, can I ask a question about the apportionment issue? So my understanding is the district court apportioned 90% of attorney's fees when Emerson and Facebook were joint defendants. If we were to find that that was an abuse of discretion, what do we say to the district court? Do we say it has to be 50-50? Or does the district court just need to reconsider it again? What standard do we give to the district court? Well, certainly in Corder v. Gates, and it's repeated in cases like Davis, this court has said apportionment should be based on time, not culpability. In this case, I think it would be a fair assessment that 50% of Bladrum's time was spent going after Facebook and 50% after Emerson. So yes, 50-50 would be a fair assessment. To be clear on the record, though, the court did not find that it was apportioning in phase two 90% of the time to Emerson and 10% to Facebook. It does not make that express finding. If you look at page 26 and the pages that precede it, it talks about block billing. It talks about other errors. It talks about Facebook-only time. And then it just says 10% will be reduced in phase two. But it does not explain that that is a 10% apportionment. It never says that. And what's curious about what the district court did is in phase three, when Emerson was out of the case, it reduced it by the same amount as phase two, which was by 10%. So one of the hallmarks of Ninth Circuit jurisprudence is that the district court, when issuing a fee award, has to explain its rationale. What was he deducting for block billing? What was he deducting for excess? What was he deducting for fair apportionment to Facebook and Emerson? To your point, I think it should have been 50-50, but the decision that he rendered doesn't make that clear. Ninth Circuit law would request that clarity. But yes, Your Honor, Emerson thinks and could live with the fair outcome being on the apportionment issue 50-50. And to be clear, that would moot, in our view, the offset issue. Counsel? Yes, Your Honor. Do you think the representation that the settlement with Facebook did not include any attorney's fees? So, Your Honor, we don't know. We've not seen the settlement agreement. But I can tell you that the same issue arose in Corder of E. Brown. In Corder of E. Brown, the settling defendant had a settlement agreement that said each party to bear their own attorney's fees and costs. The district court judge said, based on that, that there shouldn't be any offset. The Ninth Circuit said, that's not correct. We're not gonna let a settling defendant and the plaintiff game the system by putting that language in and avoiding an offset. To the extent that Blade Room pursued Facebook and spent their time and money doing so and they reached a settlement, any settlement in a litigation would contemplate, what did it cost me to go after this party and I want a fair return? And so what Corder of E. Brown states in unequivocal terms is that where there's a settlement, the district court judge needed to look at it and it needed to fairly contemplate how much should Emerson have to bear. And if you look at this, just think about it from the standpoint, what if Facebook had not settled out and there was this finding and fees were awarded? Emerson wouldn't be left paying all the fees. That would be a portion between Facebook and Emerson in some fair way. That calculus should not change just because Facebook settled out and under Corder of E. Brown, the Ninth Circuit says that absolutely that had to be considered. Can I ask though, in making that decision, the district court made the explicit finding that Blade Room did not receive any fees from the Facebook settlement. So isn't that finding entitled to deference? And so therefore we are bound by that unless your argument is clearly erroneous. It is clearly erroneous. It's a citing lawyer argument. The best evidence of whether Facebook monies were used to pay Pharrell Affirm would be what was the fee agreement? What was the settlement agreement? And what was the payment history? That is like, you could put that amount of discovery in a white manila folder. We asked for that discovery and we were declined it. So the district court judge has no information, no competent information, and certainly not the best evidence to assess whether Facebook money was used to pay Pharrell. You wanna save any time for rebuttal, Mr. Telsher? Yes, Your Honor, I will save the remaining time. Thank you. All right, thank you. Mr. Fisher. Good morning, Your Honors, and may it please the court, Jeffrey Fisher on behalf of Blade Room. So let me just start at an overview. It was about seven years ago that Blade Room's Paul Rogers received an email from a client that indicated that Emerson was building a data center for Facebook using Blade Room's stolen technology. And that began what became this litigation. Litigation was started nearly six years ago, and it has taken nearly six years of hard-fought litigation for Blade Room to vindicate its rights to trial and finally get to this point. It wasn't easy, faced two very large corporations with what the district court found to have, quote, seemingly endless resources with, quote, formidable defense teams that, quote, significantly outnumbered our team. That's at pages 23 and 24 of the court's order of the record. Well, we don't know what Emerson spent to defend this case. We do know what Facebook represented to the court six months before trial, when it represented to the court and submitted a declaration that it had incurred over $13.5 million in fees as of that point. And that was six months before trial. We cited that in the record. This was no average case. This was a very hotly litigated case involving over 1,000 docket entries, 58 depositions, millions and millions of pages of documents. As the court has already indicated, a 21-day trial, significant motion practice against these two corporations and their legal teams. So, counsel, that's all understood. But what does that have to do with the block billing, the lack of contemporaneous records, and the failure to disclose the billing to Emerson prior to the hearing? Sure, Your Honor. And I did want to address your comment that you, I think you used the term, it seemed like a bit casual given the fee award. I would disagree with that, Your Honor. I think the process that occurred here was significant. It lasted about a year. It involved three rounds of briefing. It involved an appointment of a special master. It involved objections to the special master's report. It involved ultimately the production of our records, billing records to Emerson a full month before trial, which they had a full month to look at and review. Well, they were heavily redacted in all fairness. Well, they were redacted, Your Honor. We believe the redactions were appropriate to protect privileged information. They had them a full month before the hearing. Had Mr. Telcher or his team had a question, as was the course in this litigation and every litigation, he could have contacted us on the redactions. He didn't and instead waited till the hearing. Counsel, he doesn't have an obligation to contact you regarding the redactions. You have an obligation to document the amount of attorney's fees you want. I was a district court judge before I became a court of appeals judge. Judge Murphy is a district court judge. I saw these applications all the time and block billing immediately raised a red flag in my mind, especially when the block billing had numerous duties linked together. So if you're requesting fees in the tens of millions of dollars as a district court judge, I would have looked scant at block billing at retroactive records. So I had some problems with the way that this, that's why I said it was casual because the block billing and the fact that the records were not contemporaneous to be requesting sums of this magnitude would have raised a question in my mind as a district court judge. Sure, sure, your honor. And let me tackle that head on. First of all, we start with what was submitted with the initial motion for fees, which included a almost 50 page, very detailed declaration of mine that went through the litigation in phases where we broke down who did what, who worked with who, who helped whom. We also, as the court, just on the contemporaneous records point, the billing records of our firm, of Ferrella were contemporaneous. They were submitted initially to the special master for in-camera review, and then ultimately produced to Emerson. Those were contemporaneously maintained. They did include block billing, which I'll get to in a moment. The part that was not contemporaneous was Mr. Joy, the in-house counsel. The law is quite clear that for in-house counsel in California and elsewhere, in-house counsel is not required to maintain contemporaneous records. Well, but that makes it difficult to determine whether or not the in-house counsel was actually performing work as counsel, or whether it was performing work as a liaison. So that's why it's important for in-house counsel to keep contemporaneous records so the court can be assured that the work that was being done is actually work that should be considered for payment. Sure, and I appreciate that, Your Honor, and the district court did as well. And in its discretion, it looked at that and it determined that based on the block billing and the records that it had, that with respect to Mr. Joy, it was only gonna give us 45% of his time. The records we did submit were, in some sense, were contemporaneous. They included, for example, in the record, there are summaries of the documents that Mr. Joy reviewed, which showed that he reviewed over 40,000 images of documents on 370 different days. Those records were clear as to what he did. We also included travel records and the like to help put the pieces together. But I agree with you, however, that it might have helped us had he had contemporaneous records. And what both the special master and the district court did was they significantly gave us a haircut on the requests we were making for Mr. Joy's fees, in part because of it. The other point I wanna raise on Mr. Joy's fees were, Mr. Telstra's incorrect. He indicated that there was nothing in the record, that Mr. Joy was always performing his in-house counsel, and that the district court did not look at that. The district court absolutely looked at that. It's covered on three pages of the court's order. If you look at EM 9 to 11, the district court walks through for Mr. Joy what he did that, in the district court's view and in the district court's discretion, seemed to be more of a traditional in-house counsel role, which the district court determined was not compensable. On the other hand, on page 11 of the district court order, the district court found, based on what it reviewed, as well as its own familiarity with the litigation, that, quote, Mr. Joy also performed legal work that would otherwise be performed by outside counsel. And he goes on to discuss that over the next several paragraphs of the order. So the district court, which has the Supreme Court and this court have repeatedly reaffirmed the discretion of a district court in this context of awarding fees, looked very carefully at what Mr. Joy was doing based on the submissions, and for that reason, only gave us 45% of what we were requesting for Mr. Joy. I'm happy to answer other questions on Mr. Joy's time. I have a question. Opposing counsel said that there is not one case that involves a foreign lawyer practicing U.S. law who received fees. Do you agree with that? I don't agree with that, Your Honor. I think- So cite a case involving a foreign lawyer practicing law in the United States who was awarded fees. Yeah, so I think, let me just answer it this way, Your Honor. Winter Road involved a foreign lawyer, albeit an out-of-state lawyer. Winter Road- I'm talking about an extra-national lawyer, someone who is not from the United States who practices United States law and gets a fee award. Do you have a case? We did not cite a case. I don't believe on that- Do you know one today? I don't have one for you right now, but I think we need to apply. Obviously, cases occur every day in this country where, in this case, discovery was taken out of the United States. Law firms have offices in other countries. But most of those lawyers are licensed to practice in the United States. Some may be- Even though they're stationed elsewhere. But if that's the case, there should be, you should be able to cite some authority then supporting the award of attorney's fees. I think what we need to, what I would say the court should look at is what Winter Road says. And Winter Road has two different types of, two different ways that a lawyer that does not appear can be compensable. One is if they are admitted pro hoc vichae, and the other is if they're not admitted pro hoc vichae, but they're otherwise performing services that are otherwise compensable. And the district court looked at that with respect to Mr. Joy and awarded us, in its discretion, 45% of his fees. But wasn't part of the equation that the lawyer could have been eligible for pro hoc vichae status? I don't think so, Your Honor, because Winter Road itself talks about paralegals and the like that obviously are not eligible to be pro hoc'd in and says that those types of fees are recoverable. But of course, all of that is in the context of people acting within the borders of the country. Well, again, this was an international case, Your Honor, where we had site inspections throughout the world, where there was, as the court in the first portion of the argument heard, issues of UK law that were involved. Mr. Joy is a UK barrister with technical expertise. Had we not had his services available to us, we would have had to bring lawyers to help there. So I think that under Winter Road, it is, in our view, clear that Mr. Joy, as well as the Foreign Council in the UK, it's a much smaller amount of money. What language in Winter Road do you think supports the position that a foreign lawyer practicing US law is entitled to fees? What language does it say that? Again, Winter Road says there's two ways that- Point me to the language you're talking to. Sure, on page, I think it's 822 and 824. So it's 556 F3rd. Right, I'm on 822. Point me to the precise language. So on page 822, it talks about two different ways that a lawyer, that fees can be compensable. The first, it says right here- It's talking about the rules of the Central District of California, correct? Well, the case was appealed from the Central District of California. But it's actually referencing those rules. So under the rules of the Central District of California. Well, actually for this portion, it's citing to the Second Circuit in the Spanos case. But on 822, it says- Okay, that's 823, where it's citing the Spanos case. Yeah, so I'm just reading it, starting at the bottom of 822. It says, case law suggests two ways in which the Winter Road plaintiffs could be able to recover fees for Wheatley Senior's work. The first is if the attorney at issue would have certainly been permitted to appear pro hoc vice as a matter of course, had he or she applied. The leading circuit case on this is the Spanos case. And Spanos addressed an out of state attorney, not an out of country attorney. Understood, Your Honor. Winter Road goes on on the bottom of 823 and 824 to discuss the second way that fees can be recoverable. It says the Winter Road plaintiffs can still recover fees for Wheatley Senior's work, however, because his work did not rise to the level of, quote, appearing before the district court. That's on the bottom of page 823. And the court goes on to say that the work that was done was, quote, nevertheless an integral part of the litigation process. And that was absolutely the case with Mr. Joy. But counsel, the whole predicate for the determination was that the attorney was a member of a state bar in the United States. So I don't know that this same reasoning would translate to a foreign lawyer, foreign in the sense that not practicing in the United States. I take your point, but I'm not sure I'm persuaded by it. Okay, well, Your Honor, I would just conclude by saying, I think it would be a very bad precedent, given that many of the cases that you see and that we see are international in scope that involve foreign lawyers, to have a per se rule that fees cannot be recovered for a lawyer that does work out of the country. This- Just out of curiosity, are American lawyers awarded fees in England for work that they do there? I don't know the answer to that, Your Honor. I don't know the answer. I did want to- Well, while we're being curious, is it common or even possible for a foreign lawyer to be pro-hag vichied into a American federal court? I don't know the answer to that, either, Your Honor. I think it would probably depend on the rules. I don't have them in front of me right now. Well, my understanding is the reason that American lawyers have to contract with a solicitor or a barrister is because American lawyers are not allowed to practice in the English courts. I think you may- There's litigation that goes on there, and then there's corporate work that goes on there. And I think for the litigation-related work, the barristers are required, and Mr. Joy is a barrister, a litigator in the UK. And just to conclude on this point, I just think it would be a very bad precedent for this court to cut off the work in a case of international scope like this and say that fees are not recoverable where you've got a finding of willful and malicious misappropriation and reprehensible conduct where fees are otherwise compensable. I did want to talk about the Shady Grove issue as well, which Mr. Telcher raised. So it's clear under 3426.4, the California Trade Secret Statute, that both fees and costs are recoverable. This court in the CRST case interpreted that statute to apply in federal court cases. Though at the time, the language about costs was not in the statute. Nevertheless, the court determined the fees portion as being applicable in the court, in federal courts, and determined in CRST that the fees portion does not collide with HANA or ERIE or any of those other cases, such that there's a problem with applying that. And I would say every court that has considered this issue, from CRST to Eldorado Stone, to RBC Bearings, to the Special Master below, to the District Court below, has held that there's no direct collision with applying the fees and costs provision of the California Trade Secret Statute in a diversity action in federal court. And I would note that there are other portions of California law that are applied in California federal courts all the time that are arguably not consistent with the federal rules of civil procedure, including that there's a discovery provision, section 2019.210, that are routinely applied in federal courts, even though it's a California state provision, and even though it's in the 26. Were the court to find the way that Emerson wants to and say that fees and costs are not recoverable, it would require the reversal of this court's decision in CRST. It would require the reversal of this court's decision in the Newsham case, which CRST also relies on, which said that fees and costs under California's anti-SLAPP statute were recoverable, and said did not conflict with HANA. And again, CRST relies on that case. It would also require the reversal of this court's opinion in the Claussen case, which applied Oregon's anti-SLAPP to award extra fees, and again, said there was no direct collision. So Shady Grove has not somehow upset the Supreme Court's language in HANA v. Flumer, the direct collision test. And as I said, every court to consider this issue has come up the way the district court did below, and were the court to go the other way, it would require reversal of a number of this court's decisions, and there's no reason to do so. I did wanna spend some time also on the apportionment issue. Again, in our view, this issue really begins and ends with the standard review here, which this court has repeatedly said, deference is given to district courts in determining fee awards. The district court here, following a very lengthy process, made its apportionment determinations, and it looked very carefully at the intertwined nature of the claims that involve both Facebook and Emerson. And while it is- It seemed punitive, though. I mean, 90% went against Emerson and 10% went to Facebook. Well, you know the issue, Mr. Fisher, but it just doesn't, it looks excessive to me. Well, Judge Murphy, let me address that, because I don't think that's the proper prison to look at it, 90% to Emerson and 10% to Facebook. This case, at its core, was a conspiracy case where we alleged, in the original complaint that was filed, even though Emerson wasn't a party at the very beginning, that the two worked together to build this data center using Blader's technology. So the question is whether the claims are inextricably intertwined, and this court has been very clear about that. California courts have been very clear about that. And in this case, with these facts, in phase one, the court determined that only 30% related to the claims versus Emerson. In phases two and three, the court determined, in its discretion, that 90% of the work related to the claims that were related to both Facebook and Emerson. And I think the district court's order, and we argued this with the district court, had Facebook not even been a party in this case, and had the case just been against Emerson, we would have had to have taken all that discovery of the Facebook witnesses, gotten all those documents from the Facebook people. And in fact, you can tell by the trial itself, Facebook settles the first week of trial, a number of Facebook witnesses still had to testify, because, again, at its core, this case involved a conspiracy between the two parties. And so there- Well, that's all the more reason it should have been perhaps 50-50. Well, again, the standard you look at is whether the issues were intertwined. Where one party has settled out, Emerson had pointed out that none of our cases involved parties, apportionment between parties. That's not accurate. In fact, the Corder case, the Unicom case that we cited, and the Corder versus, I believe it's Gates case we cited, do talk about apportionment amongst parties. And, again, the Corder case is a Ninth Circuit case. And therefore, again, this gets back to the district court's discretion. The district court was there, presided over the trial, presided over all the motion practice, knew this case quite well. And its discretion made its determinations as to the correct way to apportion this case. I know I'm out of time. I did want to just very briefly touch on the settlement agreement. All of the evidence in the record showed that there were no fees, both from Facebook and Blade Room. Declarations from Facebook and Blade Room said that no fees were apportioned. Why was there an objection to providing the settlement agreement to Emerson? Well, it was a confidential settlement agreement. Facebook, in particular, filed papers indicating that it wanted to keep the agreement confidential. It could have been done under a confidentiality order. Well, I'm not sure that would have satisfied Emerson. They wanted to see everything as well. Right, Emerson could have been ordered to keep everything that it saw in the settlement agreement confidential and not disclose it to any third parties. Again, here, Your Honor, there was evidence in the record that was uncontradicted. Well, it couldn't be contradicted if nobody saw the settlement agreement. Well, but the parties that were parties to the settlement agreement both submitted evidence under penalty of perjury that nothing in that agreement was to pay attorney's fees. And that is the case. We represented that to the district court below. And I'll represent again to this court that every dime we are seeking from Emerson was paid by Blade Rail. Well, counsel, I mean, there is settlement agreements and there is settlement agreements. I mean, we all know that the amount of attorney's fees could have been put in there and couched as something different. So that's not really reassuring for the parties to say, we didn't label it as attorney's fees. Well, again, Your Honor, the district court in its discretion, and it has discretion here, viewed the importance of keeping that confidentiality of that settlement agreement as important. That's an order that Emerson did not appeal in that context. I know it wants to see the settlement agreement, but there's evidence in the record from both signatories to that agreement, Facebook and Blade Room, that nothing in that agreement was in connection with fees. I'm happy to answer any other questions the court may have. All right, it appears not, rebuttal. Thank you, Your Honors, and very briefly, first on the winter route issue, as I've mentioned, footnote four makes absolutely clear that you can't proceed to the second prong if the counsel who was not PROHAC was unqualified for PROHAC. It is undisputed, Blade Room didn't dispute it, the district court didn't dispute it. Mr. Joy, as a foreign lawyer, is not qualified for PROHAC under the Northern District of California's rules. To be PROHACed in, he had to be a member of a federal court or a member of the highest, you know, a bar of the highest court in the state. So absolutely- What about under California law, California courts? Excuse me, Your Honor? What about California courts? Would he have been eligible to PROHAC in under, to California courts? Undisputed on this record that he was not qualified to PROHAC in as a foreign lawyer. In California courts as well, not just federal courts. California courts is, to my understanding, yes. A foreign lawyer cannot, and think about it, he's not trained in U.S. law. I mean, how can a lawyer who has not passed a bar exam in the U.S., how would they be qualified to come in and practice U.S. law? It doesn't make sense. And in fact, I don't know any client that would go hire a foreign lawyer to handle a case in California that involves U.S. trade secret law. So that's the rule in Winterowd. Winterowd's clear. There's no evidence- And Winterowd was interpreting a California rule. It was, Your Honor, it was for sure. So moving on, Mr. Joy, for the two reasons. One, that Judge Murphy said he was acting as a mere in-house counsel. If we allow fees, especially in the magnitude of 1.5 million, this is a recipe for every case. My in-house client, and this is the list that Judge Davila gave, reviewed pleadings, reviewed motions, sat in and helped on depo prep. All the in-house counsel that I represent are gonna do the same things. And if somebody can sit back, they knew they were going for fees, and they never kept records for Mr. Joy. And then they come in and they sign a declaration and in every case I could sign the same declaration for any of my in-house counsel. And when they say only 45% was awarded, that's $1.5 million. That's a lot of money. And this would be bad precedent. Now, if counsel tries cases or they're an active trial member, no problem. That is not this record. Mr. Joy sat in the back of the courtroom. I will point out on the expert issues, Mr. Fisher referred to CRST and Eldorado. CRST is not on point. It involves shifting of attorney's fees. There is no federal rule like there is on expert costs relating to that. So CRST is not on point. Eldorado was a district court case in which the defendant did not object. When we turn to the settlement agreement, one, Emerson did offer to receive that settlement agreement on a confidential basis. Your honor is correct that a regular protective order would have protected it. I mean, look no further than the NDA. Can we imagine that if Mr. Fisher signed a declaration saying that in his view, the NDA didn't terminate in two years and they didn't produce that? Agreements are subject to dispute. The best evidence of what the agreements were are the agreements themselves, not lawyers characterizing what those agreements are. I think with that, I don't have anything else to say unless the court has more questions for me. It appears not. Thank you, counsel. Thank you to both counsel for your helpful arguments. Thank you, your honors. Thank you. The case is submitted for decision by the court that takes us to our final case on the oral argument calendar today, Wyatt-Boris versus FCC.
judges: Rawlinson, Murphy, Bumatay